The next case is Madison Darabow versus Secretary of HHS, 2012, 5127, Mr. Shoemaker. Your Honor, thank you, Your Honors. My name is Cliff Shoemaker and I represent Madison Darabow. Madison Darabow is today 12 years old. She's been involved in this program for the last eight years. On September 20th, 2007, Special Master Millman issued a 60-page ruling in favor of Madison after extensive testimony from Dr. Blonti, who is the head of the Immunology Center at Georgetown University and whose fourth edition of the immunology textbook just came out. There wasn't any new information that came up later which was directly relevant to the rule that the petitioner is entitled to recover as long as there is not a preponderance of the evidence that factors unrelated to the vaccine cause the injury. And wasn't there a finding by a subsequent Special Master affirmed by the Court of Federal Claims that there was a preponderance of the evidence that a factor unrelated, namely a genetic defect, caused the injury? Your Honor, yes, Your Honor is correct. In over 20 years in this program, the one thing I've learned is the reason that some children react to a vaccine whereas most children do not is because of genetic susceptibility and because of the status of their immune system the date they're vaccinated. That's very clear. If our immune systems, if our genetics were all identical, then all children would either react to a vaccine or they wouldn't. So we've known for years that there are genetic differences. But the rule doesn't say except for genetic factors. No, Your Honor, the question that the Special Master Lord asked was the wrong question. The question she asked was if Madison Darabault had not had the SCN1A mutation, and she's asking Dr. Raymond, their expert, if she had not had that mutation, would she have had the seizures the day after her vaccination? Their expert, Dr. Raymond, said, no, I don't think so. That's not the right question. The correct question is, if Madison Darabault had not received vaccinations on one day, would she have developed Dravet syndrome the next day? And the answer to that question is also the same. So we have two substantial... Do we know that she developed the DA syndrome the next day? Yes, because her seizures started the next day, Your Honor. And everybody agrees that was the onset of her Dravet. But isn't there evidence in the record that she could have developed the seizures because of the fever that she developed due to a low immune system that she had? Well, actually, that's kind of interesting, Your Honor, because Madison was born on August 19th, 2001. Back on October 8th of 2001, she went to the hospital with several days of fever. So this was not a child who'd never had a fever before. She'd had plenty of fevers and never developed Dravet syndrome. She had an SCN1A mutation. What that means is she had a genetic abnormality. It doesn't mean she had Dravet. She's the only one in the world who has this particular mutation. Dr. Raymond admitted, I don't know of any other case that has this particular variation in the sodium channel gene. On the basis of that, he predicted, he could say, we're certain that she was going to have this course. That's absolutely not true. As a matter of fact, he admitted, and the literature shows us, that a third to one-half of the cases of Dravet syndrome, that's where you actually develop a seizure disorder, a third to one-half of those cases occur within 72 hours of DPT vaccination. I understand this argument now to be you're seeking to undermine the factual underpinnings of Judge Lord's opinion. Absolutely. In your brief, I think you present two arguments. One is the wrong legal standard was applied in assessing the government's burden, and then your secondary argument was essentially the factual challenge. Yes, Your Honor. I think the finding of Special Master Lord was arbitrary, capricious, and certainly abuse of discretion. Let's talk about Dr. Raymond, the only expert that this decision has relied upon. Dr. Raymond, at age 531, has seen four to five cases of Dravet in his entire career. At age 534, his primary expertise is in adrenal leukodystrophy. He was also recognized as having a broader skill set than the expert on your side, right? Yes, sir. Dr. Tornatore was the neurologist who testified for us. Are you attacking Dr. Raymond's standing? Is that what you're doing now? No, I'm talking about his actual testimony. I'm going to show why, even if you take his testimony, the decision was an abuse of discretion. By his very own testimony, he said that his main interest, adrenal leukodystrophy, has about 500 gene types that have been identified so far. But he admitted that environmental factors can impact the expression of the disease. He even said head trauma can prompt the initial onset of the disease. What disease? The Dravet's? Leukodystrophy. His main interest of research. Okay. But then when we started talking about Dravet's, something that he's had four or five cases of experience with, as opposed to his main area of interest, we also know that in Dravet's there are at least 500 genotypes that have been identified as well. It's not a single gene that we're talking about here. We're talking about multiple variations in the sodium channel. He admits he's not an epilepsy expert, A536. He admits that complex febrile seizures can hurt children's brains at A537. Are you asking us to reevaluate the evidence? Absolutely. Because it was contrary to the fact, the decision is absolutely contrary to the evidence, even looking at Dr. Raymond. Don't we give deference to the special master's findings of fact? I think, Your Honor, if you will take the time to read the court's questioning of Dr. Tornatore, which is A611 to A639, and if you will compare that with the court's questioning of Dr. Raymond at A669 to A675, and A568 to 577, you will find a special master who did everything in her power to help Dr. Raymond, give her the language necessary to rule against this young girl, and everything in her power to try to get Dr. Tornatore, she was practically another Department of Justice attorney, taking on Dr. Tornatore. You're challenging now the bona fides of the judge. The special master's lawyer is no longer a special master. She's not a judge, she's a special master. That's pretty strong language. It is strong language. The special master had her thumb on the scale from the get-go. Not only that, she chastised me for interrupting someone, which I just did to you, and I'm sorry, I apologize, I do that often. I also do it, I'm sorry. But she interrupted Dr. Tornatore. Look at the transcript. Wouldn't let him finish answers to questions. If you look at those portions that I'm asking, you'll find out what I'm talking about. Let's go back to Dr. Raymond's testimony. Did he say that the SCNA gene mutation was the sole cause of the DeVay syndrome? Well, that's interesting, because he really didn't say. But his opinion didn't fit the facts of this case. We have to understand the facts of this case. Madison gets a DPT vaccination. The next day she has a seizure that lasts for over an hour. That's a long seizure. It's recognized that when you have seizures that long, it's able to injure the brain. So that's one thing we have in this case. We have brain injury, which was proven a year later, and Dr. Tornatore testified about that. He testified about the MRIs and how they showed evidence of scarring. But after she was tested, when she was taken to the hospital, she got the vaccine. The next day she had seizures. She was tested, and there was no brain damage. And Dr. Tornatore said you wouldn't expect to see it that quickly. You're not going to see evidence of scarring or gliosis in the brain that quickly. It doesn't happen that way. He testified that it takes months for that to occur, and I can give you that reference if you'd like. But let me go on, because the other thing that happened to this girl is within two weeks she was diagnosed with Kawasaki's disease. Now, both Dr. Blondie and Dr. Tornatore testified that her vaccination caused her Kawasaki's. It's an autoimmune condition, and a vaccine or a viral illness, anything, can cause the immune system to become misdirected and attack cells. In this case, she developed the disease Kawasaki's, which is like a vasculitis. The hallmark of Kawasaki's is spiking fevers. So now you have a girl who has a sodium channel mutation, which means she's probably susceptible to having seizures. I mean, sure, we agree she's genetically susceptible. She gets a vaccination, and we know that a third to a half of the cases of Dravet's occur after this vaccine. So she gets the vaccine. The next day she has seizures. She has multiple seizures. She goes on to develop a chronic seizure disorder. You're not arguing that the vaccine caused the Dravet's, are you? No, no, no. First of all, let me explain. SCN1A mutation is a mutation. It doesn't become Dravet's until after you start having seizures. We don't know how many people there are who have her particular mutation and are absolutely normal. We do know that the parents of children who have sodium channel mutations, where they do have seizures, where the kids have seizures, we know that their parents, who have the same genes, are absolutely normal. So we know there's no one-to-one relationship between, if you have this gene, you're going to have seizures. The court was kind of like saying, if I'm in an auto accident, I'm a hemophiliac, and I walk away, but I'm bleeding internally, and I don't know it, and I die, the court's saying, sorry, you can't recover because you're a hemophiliac. That was the sole cause. That's not what we have. Yes, the genetics was important in this case, but the vaccine precipitated the first seizure, which was the onset of Dravet's. The vaccine also caused Kawasaki's, which gives spiking fevers, which causes more seizures, because the children are very susceptible to fever at that point. If you look at Special Master's Millman's 60-page decision, Dravet's was even talked about back then, before they did a test, and knew that she actually had a specific mutation. So Dravet's was discussed back in the initial ruling, where Special Master Millman, in 60 pages, went through and described all the things going on, and said, you can't tease out what's what. Right, but at the time that that was being discussed, Special Master Millman was unaware of the fact that the child had been diagnosed with Dravet. No, and it wasn't until later, when the child was tested, and there was a gene finding that... What was the stage of the proceedings before Special Master Millman, when the diagnosis of Dravet's was confirmed? After she made her... Was she writing her opinion, what was happening? No, she wrote her opinion. After her opinion, we go on to the damages phase. I understand. And this is where we collect more information. I know that, but I mean, the diagnosis of Dravet's was before the damages stage. No, actually it wasn't. As a matter of fact, it may have been... What was the timing? The timing may have been there, but what happens is, when you go to the... When you say the timing may have been there, I don't hear what you're saying. I'm just trying to find out... Right. When the case was still before Judge Millman, had the child been diagnosed with Dravet? No. Yes or no? I don't know that the child had been... You don't know the date? You don't know the date that diagnosis was made? I don't know the date of the diagnosis. What I'm trying to tell you is that after the... I'm not going to penalize you for this. I'm just saying, you're telling us in essence that... I believe that the record shows that during the damage phase that another test was ordered, and it was at that test that she was found to have the SCNAI mutated... That may be correct. It may be that the test was ordered before the hearing with Millman. I don't know the answer to that. What I'm trying to tell you... We do know that the diagnosis wasn't in front of Judge Millman. And what I'm trying to tell you is that that's not unusual. When you have a child who's getting ongoing medical treatment, there comes a point in time when you're going to go to a hearing, so you aren't going to keep collecting records. We think we have enough records to decide the case. The case was decided. Then in the damages phase, these records, new records, were sent to the Department of Justice. They had the records for over a year before somebody looked at those records apparently and said, oh, there's Dravet. There's a test that was done here. So I don't know if the test was done before or after, but the point is... It was done in December 2005. Okay. The point is it wasn't recognized until much later, and the government had the records for a year before anybody picked up on it and said, we want to go back and reconsider it. Schumacher, you want to save some time? Yes, please. Is it Mr. McLeod? It is Ron. Good morning. May it please the court, counsel. My name is Glenn McLeod. I represent the appellee on this appeal. The case that's before the court today is a tragic case. It involves a little girl who does have profound mental and developmental delays, and as the court is well aware, given the procedural history, it was initially posited that this child's neurologic condition resulted from a series of routine childhood immunizations. Of course, all of these cases that come before us are tragic, and from a court standpoint, it's not a question of do we feel badly. Of course we do, but we've got the law to deal with, and we've got the special master in the claims court, and whatever deference we owe. Which is what I was coming to in my argument, and that is although this is a tragic case, there is clear law that needs to be applied to the facts in this situation. The first special master's decision, special master Millman's decision, occurred at a time when the record was not complete. As this court has indicated, in December of 2005, Madison Darabaud did undergo genetic testing, which came back with... But Mr. Shoemaker says there are always further tests, and when is the record set? Well, this record is set prior to judgment. I mean, at any time up until the date of judgment, the special master has the statutory authority to request additional information. Wasn't there a judgment made with respect to the onset, with respect to the connection? There was no judgment made as far as the concept... Findings. Findings of fact were made on an incomplete record. That's correct. At the time special master Millman issued her decision, the testing was done 18 months prior to that hearing. In other words, this testing was in existence. The diagnosis of... Prior to the hearing or prior to the decision? Prior to hearing. The hearing in this case occurred... Before Judge Millman. That's correct. The hearing occurred on September 20th, 2007. The Gervais testing occurred in December of 2005. Special master Millman's decision occurred in December of 2007. 17th. That's correct, Your Honor. The medical records were requested because of an adverse decision against the government. The case moves into damages. And it's not uncommon, therefore, for the parties to say... So at that time, I mean, looking back, we can say that the record was incomplete or not everything was in. But the finding that was made at that time was that she was entitled to compensation. So, legally, there was a finding of an onset, and she made a finding of a connection. She based it on expert testimony to prominent doctors, prominent and expert in this particular field. She makes a finding she's entitled to compensation. Yes, Your Honor. But that decision was flawed. It was flawed in the sense that we now know, as a matter of fact, that it was based upon evidence that was outcome determinative that was not disclosed to her. And you're saying the first decision was not irrevocable until actually damages had been awarded? A special master has the discretion to reopen a hearing based upon new evidence. It happens routinely at times in vaccine cases when the evidence, especially in this case, is relevant and material. My colleague indicated that SCN1A was discussed in the first hearing. I think special master... The first opinion is irrevocable. He's not making that argument. He's challenging the underpinnings of Judge Lord's opinion, right? That's correct, Your Honor. I mean, I certainly didn't mean to sound critical asking about the timing of when the tests were done, but the short of the matter is that the tests were not in front of Judge Millman. That's correct. And whether that would have affected Judge Millman, we don't really know. And I don't understand the appellant to be saying it's against the law for the government to mount its argument about factor unrelated as during the damage phase. Very well, Your Honor. It sounds to me like procedurally there's no real objection. I think that your adversary is putting his eggs in the factual basket here. He's asked us to go back and review carefully. What's your response to his argument? The special master, special master Lord, applied the correct evidentiary standard. She stated a rational basis for her conclusion that Madison's genetic abnormality caused both her susceptibility to the post-vaccine seizure that occurred, and more importantly, her numerous subsequent seizures and her neurologic condition. And thus the appellants failed to prove entitlement to compensation by preponderance of the evidence. In her lengthy opinion, over 55 pages, by special master Lord, she considered all of the relevant evidence as the finder of fact and properly determined that the government had established a factor unrelated to vaccination by a preponderance of the evidence and that that was the cause of Madison's seizure disorder and her delay. Did it have to be the sole significant unrelated factor? By law, it has to be what was principally responsible, is what the statute uses. This court has, in dicta, I believe, in the de Bazin case, indicated that in order for the government to prevail, it must demonstrate that the factor unrelated to vaccine was a sole substantial factor in causing that condition. And the government did that in this case. The special master and Judge Miller below, in reviewing all the record evidence, indicated that there was overwhelming evidence, more than a preponderance of the evidence, that the respondent had demonstrated a legal factor unrelated to vaccination in this case. And how related is this case to Stone and Hammett, if that's the previous case? Stone and Hammett were cases involving the SC18 genetic malformation in which this court also... That's not a precedent because we're dealing here with the case's own record. That's correct, Your Honor. The Stone and Hammett cases may not be a binding precedent, per se, in this case, but they were both cases in which panels of this court examined the SCN1A mutation and its impact on the child. So it was not exactly the same mutation as this child? This child had a unique form of a mutation? This child has a unique SCN1A, and it's important to understand that the SCN1A gene has many different points on it, and you can get a spectrum of neurologic disorders. But in Madison's case, the exact location of this particular malformation reliably results in a very severe phenotype, phenotype being how it expresses itself. That is what the evidence showed in this case, both medical literature and expert testimony. In the earlier case, was the knowledge of the genetic defect made known to the fact finder after a previous decision of liability? Yes, Your Honor. It was either Stone or Hammett. I believe it may have been the Hammett case in which the laboratory evidence confirming an SCN1A malformation came up after the prima facie case determination. The special master reconsidered that evidence and found that the government had, in fact, demonstrated a factor unrelated, namely, an SCN1A. But that was before a decision had actually been made? That's right. This case is a little different. I thought in both of those cases, the same special master that had heard the case, but unlike this, before a decision had been rendered and they went to damages. Correct, Your Honor. The evidence of the genetic defect surfaced itself while the case was still live. Right, but although similar to those cases, the evidence of this SCN1A malformation was in existence 18 months prior to that hearing, the first hearing in this case. That is, it was in existence and presumably within the petitioner's control to produce. It was not produced, and the government is not alleging any malfeasance on the part of the petitioner, but it just wasn't disclosed and it was outcome determinative. And unlike those other two cases, this is a unique case in that that evidence was somewhat embargoed from consideration on the prima facie case. That is, both special master Millman, who didn't know of its existence, and special master Lord, who did, considered it solely in the connection with the government's factor unrelated defense, as opposed to, as this court had indicated in Doe 11, considering this evidence when considering the petitioner's prima facie case. And the government maintains that had the special masters done so, petitioners would not have been successful in demonstrating that the vaccination was a substantial factor in causing Madison Derabo's neurologic condition. It's also important to note that this is a Gervais syndrome case, which means that Madison was born with the genetic malformation. Are there people walking around with that particular gene mutation that don't have DS and they're unaware of the fact that they have the mutation? Based on the evidence in this case, their secretary would say no, that given this type of mutation, it would manifest itself based on what is known with a severe form of epilepsy, in this case severe myoclonic epilepsy of infancy, SMEI. Now, it doesn't mean that there aren't people with malformations in their SC1A gene. The evidence in this case does show that you can have a malformation in the SCN1A gene and have familial hemiplegic migraines, for example. Now, these are conditions that are inherited, but in Madison's case, she suffered a de novo missense mutation in a conserved region of the gene. Now, what these things comport to is a very severe neurologic outcome, and that is known. Now, is it known per very specific point mutation? Dr. Raymond testified that as far as he knows, that specific point mutation has not been written on, but it is in a region of that genome in which it is well known to cause very severe neurologic outcomes. Isn't Dravet medically classified as a syndrome because it's simply an aggregate of symptoms? We really don't know the cause of Dravet. No, Your Honor. It's more than that. The special master found based on the evidence this is a distinct known condition. There are characteristics, clinical characteristics for the diagnosis. On page A92 of the special master's decision, it discusses the core features required for classification as classical Dravet syndrome. We're defined as following. First, normal cognitive and motor development previous to seizure onset. Madison Darabault had that. Up to about seven months of age, she had normal development. No seizures, no evidence of cognitive delay for an infant. The next is onset of seizures before one year. Her onset occurred at seven months. Seizures mainly triggered by fever, which was in this case found to be a febrile seizure. Long-lasting seizures, greater than 15 minutes. She seized approximately one hour at that time. And later occurrence of various seizure types, febrile and afebrile. She developed both in the year following the onset of her first seizure. And then finally, later cognitive regression. And importantly in Dravet syndrome, the cognitive regression usually happens about a year later. Madison Darabault's cognitive regression occurred at that time, about a year later. She meets all of the classical definitions of Dravet syndrome. And that is the most severe prognosis for a child with this SCN1A gene mutation because every one of her neurons in her brain are built this way. So it's refractory to anti-epileptic medication. Anti-epileptic medication doesn't help. Her seizure disorder has been refractory to such medication. And so the evidence totality indicated that the vaccination played no role in her condition. Neither did it cause it, nor did it aggravate its outcome. The petitioner's comment about a number of these cases being caused by or manifesting following immunization is observational but not causal. Those same medical literatures indicated that despite a fever caused by vaccination that triggers the onset or the first unmasking, if you will, of the underlying condition, has no impact known to the ultimate outcome of the child's neurologic condition. Special Master considered all of this and determined that the petitioner had failed to establish by preponderance of the evidence that the vaccination she received caused her neurologic condition. In conclusion, Your Honor, there's no further questions. The appellants have failed to show that the Special Master applied an incorrect legal standard in this case or that her evaluation of the case was arbitrary or capricious, an abuse of discretion or otherwise not in accordance with the law. The appellants have not offered proof of any error but rather are asking this court to reweigh the evidence and second-guess the Special Master's fact-intensive decision and well-reasoned determinations. Instead, this court must determine whether the Special Master considered the relevant evidence and drew plausible inferences and stated a rational basis for her decision. Because she did all of those things, Special Master Lord's findings are entitled to deference. And the appellee respectfully requests this court uphold the opinion of the Court of Federal Claims, affirming the Special Master's decision and denying compensation. Thank you, Mr. McCloud. Mr. Shoemaker has a little more than 2 minutes to respond. Thank you, Your Honor. Special Master Lord did find that the petitioner had met her burden of proof. In other words, Special Master Lord, as well as Special Master Millman, found that the petitioner had proved that the vaccine was a substantial factor in causing her injury. You mean she proved A? A, a substantial factor. That's why this can't be a sole substantial factor. It's impossible, because it... First of all, we also know these things. We know from Dr. Raymond that Dravet's does not cause fever, and Dravet's does not cause Kawasaki. Those are two things that distinguish us from Hammett and Stone. We're not alleging in this case, as they did in Hammett and Stone, that the very first seizure was sufficient to cause all the brain injury. If you read Dr. Tornatore's testimony, he's saying that either that first seizure caused the brain injury, or her subsequent seizures due to the Kawasaki's, which was due to the vaccine, caused that injury, which was demonstrated by MRI and by spectroscopy a year later. And I urge you to read his testimony on that subject, which was never answered by Dr. Raymond. To go to your question, yes, Dravet's syndrome is a syndrome. As a matter of fact, if you look back at the Brera article, one of the articles in the appendix, I think it's the last one, the syndrome was described before we even had genetic tests. So you're absolutely right, it's a syndrome. And we have to know what Dr. Raymond says about that. He says, we don't know the incidence of SCN1A in the general population. That's A538. He says, at A539, Madison is the only one that's ever been reported with this particular mutation. So the answer to your question is, we don't know how many people are out there walking around with this same mutation. They're absolutely normal. What we do know is that children who have SCN1A mutations and are sick and have Dravet's, have parents and siblings who have the same mutation and are not. Are perfectly normal. Now, what they're trying to say is, okay, so the seizure started, so the Dravet's onset occurred after the vaccination, but if it hadn't happened then, somewhere along the line, something else, a viral illness or whatever else would have caused it. But Madison's, her gene mutation is not inherited. It's de novo. It's de novo. And we don't know, it's the only one ever reported in the literature. We don't know how many people have that mutation. We just don't know. Dr. Raymond also said, he admitted that complex febrile seizure disorders can be caused by DPT vaccine. He admitted it can cause brain injury. He admitted all those things. He said that children with SCN1A are not protected from a vaccine adverse reaction at A538. So there's no reason to think that the fact she had this mutation would protect her from something we know can happen from a vaccine. As a matter of fact, as Dr. Tornatore said, it made her more susceptible. It wasn't the cause. It wasn't the sole substantial cause. It was a cause. A lot of these cases are cases where things come together to cause it. If that weren't the case, then every child who got a vaccine would have a reaction. Mr. Shoemaker, you may have noted your red light is on. We understand your conviction and passion about the case. We'll take it under advisement. Thank you.